| | |
|---|---|
| **ASHLEY OWINGS,** individually, and on behalf of all others similarly situated**,** | |
| Plaintiff, | **Case No.** |
| | CLASS ACTION |
| v. | JURY DEMAND |
| **MEDUSIND, INC.,** | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff, Ashley Owings brings this Class Action Complaint, against Defendant, Medusind, Inc. ("Medusind" or "Defendant"), and each of their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, members, and/or other related entities, and upon personal knowledge as to her own actions, and information and belief as to all other matters, allege as follows:

### INTRODUCTION

1.     This action arises out of the public exposure of the confidential, private information of Defendant's current and former patients, Personally Identifying Information[1] ("PII") and

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the Data Breach.

Protected Health Information ("PHI")[2] (collectively "Personal Information"), including of Plaintiff and the Class Members, which was in the possession of Defendant during on its systems, on or around December 29, 2023, caused by Defendant's failures to adequately safeguard that Personal Information ("the Data Breach").

2. According to Defendant, the Personal Information unauthorizedly disclosed in the Data Breach includes patients' health insurance and billing information (such as insurance policy numbers or claims/benefits information), payment information (such as debit/credit card numbers or bank account information), health information (such as medical history, medical record number, or prescription information), government identification (such as driver's license or passport number), and other person information (such as date of birth, email, address, or phone number).[3]

3. Medusind is a revenue cycle management company that provides billing support to health care organizations.[4]

---

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a group health plan. *Id. Covered entity, Health plan*. A "business associate" is defined as, with respect to a covered entity, a person who: "creates, receives, maintains, or transmits protected health information for a function or activity regulated by [HIPAA], including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities listed at 42 CFR 3.20, billing, benefit management, practice management and repricing…" *Id. Business associate*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, Dep't for Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 5, 2022). Medusind is clearly a "covered entity," subject to HIPAA, and some of the PHI compromised in the Data Breach is "protected health information," subject to HIPAA.

[3] Notice of Data Breach ("Notice") attached hereto as **Exhibit A**.

[4] *Id*.

4.     Defendant failed to undertake adequate measures to safeguard the Personal Information of Plaintiff and the proposed Class Members.

5.     Although Defendant purportedly discovered the Data Breach on December 29, 2023, they failed to immediately notify and warn current and former patients. In fact, Defendant waited ***more than one year*** to provide written notice to Plaintiff and the proposed Class.[5]

6.     As a direct and proximate result of Defendant's failures to protect current and former patients' sensitive Personal Information and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class Members have suffered widespread injury and damages necessitating Plaintiff seeking relief on a class wide basis.

## PARTIES

7.     Plaintiff, Ashley Owings is a natural person and resident and citizen of California, where she intends to remain. Plaintiff Owings provided her Personal Information to a health care provider which used Medusind for billing support.

8.     Defendant Medusind, Inc., is a corporation organized and existing under the laws of the State of Florida with a principal place of business at 6100 Blue Lagoon Drive, Suite 450, Miami, FL 33126.

## JURISDICTION & VENUE

9.     This Court has original jurisdiction over this action under the Class Action Fairness Act 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant, namely Plaintiff a citizen of California.

10.     This Court has personal jurisdiction over Defendant because they are organized and

---

[5] *Id.*

exist under Florida law and do substantial business in Florida.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Medusind's

principal place of business is in this District and a substantial art of the events, acts, and omissions

giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND FACTS

### A. Defendant Medusind, Inc.

12.     According to Defendant Medusind's Website[6]:

Medusind is much more than a billing service. Medusind becomes our client's
Revenue Cycle partner in every sense of the word. Team Leaders and Department
Heads provide unwavering leadership to their passionate and capable RCM service
delivery teams whose sole purpose is to improve the financial performance and
adhere to all compliance regulations and guidelines to mitigate exposure for our
customers.

13.     On information and belief, Medusind is a service provider of a health care provider

visited by Plaintiff performing medical billing for health care provider and was provided with

Plaintiff's and the proposed Class Members' Personal Information.

14.     Medusind collects and stores Plaintiff's and the proposed Class Members' Personal

Information on its information technology computer systems, on information and belief in Florida,

including but not limited to patients' health insurance and billing information (such as insurance

policy numbers or claims/benefits information), payment information (such as debit/credit card

numbers or bank account information), health information (such as medical history, medical record

number, or prescription information), government identification (such as driver's license or

passport number), and other person information.

15.     When Defendant collects this Personal Information, they promise to use reasonable

care to protect and safeguard the Personal Information, from unauthorized disclosure.

---

[6] https://www.medusind.com/about-medusind/ (last accessed Jan. 9, 2025)

**B. Defendant Failed to Safeguard Personal Information—the Data Breach**

16.     On information and belief, according to Defendant, on or around December 29, 2023, Medusind experienced a cyberattack to its computer information technology systems by an "unauthorized threat actor," which resulted in the unauthorized disclosure and exfiltration of patients' Personal Information, including of Plaintiff and the proposed Class Members, including patients' health insurance and billing information (such as insurance policy numbers or claims/benefits information), payment information (such as debit/credit card numbers or bank account information), health information (such as medical history, medical record number, or prescription information), government identification (such as driver's license or passport number), and other person information —the Data Breach.[7]

17.     Nevertheless, Defendant waited over ***one year*** to inform affected current and former patients of the unauthorized disclosure of their Personal Dara Breach in the Data Breach, waiting until January 7, 2025, to provide written notice to Plaintiff and the Class.

18.     On or about January 7, 2025, Medusind began sending written notice of the Data Breach to affected current and former patients, including Plaintiff, and the proposed Class Members.[8]

19.     The Notice of Data Breach[9] stated:

> You are receiving this letter because your information may have been impacted by a cyber incident experienced by Medusind, Inc. ("Medusind") that took place on December 29, 2023, and that we discovered later the same day. Medusind is a revenue cycle management company that provides billing support to health care organizations, including your health care provider. Through an investigation, Medusind determined that information belonging to you may have been accessed without authorization. The purpose of this letter is to give you an overview of the data security incident, our response to it, and let you know about the support we are

---

[7] Exhibit A.
[8] *Id.*
[9] *Id.*

offering to you.

**What Happened**

On December 29, 2023, Medusind discovered suspicious activity within its IT network. Upon discovering the suspicious activity, Medusind took the affected systems offline and hired a leading cybersecurity forensic firm to conduct an investigation. Through this investigation, we found evidence that a cybercriminal may have obtained a copy of certain files containing your personal information. Additionally, we implemented enhanced security measures to prevent similar incidents from occurring in the future.

**What Information Was Involved**

Medusind has determined that some of these files contain name and information in one or more of the following categories: health insurance and billing information (such as insurance policy numbers or claims/benefits information), payment information (such as debit/credit card numbers or bank account information), health information (such as medical history, medical record number, or prescription information), government identification (such as driver's license or passport number), and other person information (such as date of birth, email, address, or phone number). The particular type of information involved depends on the individual.

20.     In addition, in its Notice of Data Breach, Medusind offered complimentary credit monitoring through Kroll for two (2) years.[10] Medusind's offer of credit monitoring as part of the breach notice further highlights the inherent risk of identity theft Plaintiff and Class Members face due to the data breach.

21.     The Notice of Data Breach did not further elaborate on the nature or extent of the Data Breach, omitting its scope or size.

22.     Defendant's conduct, by acts of commission or omission, caused the Data Breach, including: Medusind's failures to implement best practices and comply with industry standards concerning computer system security to adequately safeguard patient Personal Information, allowing Personal Information to be accessed and stolen, and by failing to implement security

---

[10] *Id.*

measures that could have prevented, mitigated, or timely detected the Data Breach, and by failing to adequately train its employees on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems, resulting in the Data Breach.

23. On information and belief, as more fully articulated below, Plaintiff and the members of the proposed Class Members' Personal Information, was unauthorizedly disclosed to, and actually exfiltrated by, third-party cybercriminals in the Data Breach, has now or will imminently be posted to the Dark Web for public viewing and use, in the public domain, and/or utilized for criminal and fraudulent purposes and misuse.

**C. Plaintiff's Experience**

24. Plaintiff, Ashley Dixon, is a patient of a health care provider that utilized Medusind for medical billing services.

25. As a condition of receiving medical services, Plaintiff was required to provide her Personal Information to her health care provider, which that health care provider then provided to Medusind in connection with Medusind's medical billing services, including but not limited to health insurance and billing information (such as insurance policy numbers or claims/benefits information), payment information (such as debit/credit card numbers or bank account information), health information (such as medical history, medical record number, or prescription information), government identification (such as driver's license or passport number), and other person information (such as date of birth, email, address, or phone number).

26. Plaintiff typically takes measures to protect her Personal Information and is very careful about sharing her Personal Information. Plaintiff has never knowingly transmitted Personal Information over the internet or other unsecured source.

27. Plaintiff stores any documents containing her Personal Information in a safe and

secure location, and she diligently chooses unique usernames for her passwords and online accounts.

28.     In entrusting her Personal Information to Defendant, Plaintiff believed that, as part of the payments for medical treatment and services, Defendant would adequately safeguard that information. Had Plaintiff known that Defendant did not utilize reasonable data security measures, and that the health care provider did not ensure Medusind utilized reasonable data security measures, Plaintiff would not have entrusted her Personal Information to Defendant.

29.     Plaintiff received Medusind's Data Breach Notice dated January 7, 2025, informing her that her Personal Information, including her health insurance and billing information (such as insurance policy numbers or claims/benefits information), payment information (such as debit/credit card numbers or bank account information), health information (such as medical history, medical record number, or prescription information), government identification (such as driver's license or passport number), and other person information (such as date of birth, email, address, or phone number) was impacted and exfiltrated in the Data Breach, if on file for her.[11]

30.     As a direct and proximate result of the Data Breach permitted to occur by Defendant, Plaintiff has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Personal Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale; Plaintiff has been and will be forced to expend considerable time and effort to monitor her accounts and credit files, changing her online account passwords, verifying the legitimacy of Defendant's Data Breach Notice and researching the Data Breach, to protect herself from identity theft and

_____
[11] Exhibit A.

8

fraudulent misuse of her Personal Information, disclosed as a result of the Data Breach.

31.     In addition, as a result of the Data Breach, Plaintiff also suffered diminution in the value of her Personal Information, a form of intangible property that she entrusted to Defendant for the sole purpose of obtaining medical services.

32.     Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of her Personal Information in the Data Breach.

33.     She fears for her personal financial security and uncertainty over the information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of her Personal Information. She is experiencing feelings of anxiety, embarrassment, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

34.     Plaintiff was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing her highly sensitive Personal Information and the harm caused by the Data Breach. She was also outraged that Defendant took over a year to notify her of the Data Breach even as it was discovered in December 2023.

35.     As a result of the Data Breach, Plaintiff faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like her date of birth.

36.     Furthermore, Plaintiff's sensitive Personal Information remains in Defendant's possession without adequate protection against known threats, exposing Plaintiff to the prospect of additional harm.

**C.  This Data Breach was Foreseeable by Defendant.**

37.     Plaintiff and the proposed Class Members provided their Personal Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

38.     By failing to do so, Defendant put Plaintiff and Class Members at risk of identity theft, financial fraud, and other harms.

39.     Defendant tortiously, or in breach of their implied contracts, failed to take the necessary precautions required to safeguard and protect the Personal Information of Plaintiff and the Class Members from unauthorized disclosure. Defendant's actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

40.     Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing Personal Information and the critical importance of providing adequate security for that information.

41.     According to a Chief Strategy Officer at ClearDATA, "[i]t's no secret that healthcare is the industry most plagued by data breaches. Patient data is the most valuable, making it targeted by bad actors."[12]

42.     Moreover, healthcare companies are targeted because of their cybersecurity vulnerabilities: "…healthcare is also targeted because it is very vulnerable. Many healthcare providers use outdated IT infrastructure and operating systems that can no longer be patched or supported, such as Windows 7 and Windows Server 2008, even after Microsoft retired them.

---

[12] Sanjay Cherian, Forbes Magazine, "Healthcare Data: The Perfect Storm," January 14, 2022, available at https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56c88 (last accessed. Jan 9, 2025).

Further, more than half of medical devices operate on legacy systems, and 83% of medical imaging devices are on outdated operating systems that no longer receive patches/updates. This creates significant cybersecurity vulnerabilities and makes it much easier for bad actors to find an entry point into the network." [13]

43.     Cyber-attacks against healthcare organizations such as Defendant are targeted and frequent. According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across U.S. healthcare organizations. Significant security incidents are a near-universal experience in U.S. healthcare organizations with many of the incidents initiated by bad actors…"[14]

44.     In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[15]

45.     Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.[16]

46.     According to the Identity Theft Resource Center's January 24, 2022 report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[17]

---

[13] *Id.*
[14] HEALTHCARE INFORMATION AND MANAGEMENT SYSTEMS SOCIETY, *2019 HIMSS Cybersecurity Survey*, available at
https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last accessed Jan. 9, 2025)
[15] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed Jan. 9, 2025)
[16] *Ibid.*
[17] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for

47.     According to the ITRC's January 2023 report for 2022, "[t]he number of publicly reported data compromises in the U.S. totaled 1,802 in 2022. This represents the second highest number of data events in a single year and just 60 events short of matching 2021's all-time high number of data compromises."[18] In 2022, there were approximately 422 million individuals affected by cyberattacks.[19]

48.     Moreover, of the 1,802 data breaches in 2022, ITRC reported that 1,560 involved compromised names, 1,143 involved compromised of Social Security Numbers, and 633 involved compromised dates of birth—types of PHI included in the unauthorized disclosure in this Data Breach.[20]

49.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[21]

50.     Furthermore, Defendant was aware of the risk of data breaches because such breaches have dominated the headlines in recent years. For instance, the 525 reported medical or healthcare data breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[22]

---

Number of Compromises," Jan. 24, 2022, available at
https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last accessed Jan. 9, 2025).
[18] Identity Theft Resource Center, 2022 Data Breach Report, available at
https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf, pg. 7 (last accessed Jan. 9, 2025).
[19] *See Id*., pg. 2.
[20] *Id*., pg. 6.
[21] IBM, "Cost of a data breach 2024" available at https://www.ibm.com/reports/data-breach (last accessed Jan. 9, 2025).
[22] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf  (last accessed Jan. 9, 2025), at pg. 15.

51.     According to the U.S. Department for Health and Human Services' "2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead," "[h]ealthcare data breaches have doubled in 3 years."[23]

52.     PHI is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and sale on the Dark Web.

53.     PHI can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and medical records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

54.     Given the nature of the Data Breach, it was foreseeable that the compromised PHI could be used by hackers and cybercriminals in a variety of different injurious ways. Indeed, the cybercriminals who possess the Class Members' PHI can easily obtain Class Members' tax returns or open fraudulent credit card accounts in the Class Members' names.

**D. Defendant Failed to Comply with FTC Guidelines**

55.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

56.     In 2016, the FTC updated its publication, *Protecting PHI: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses

---

[23] U.S. Department for Health and Human Services, The Health Sector Cybersecurity Coordination Center (HC3), "2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead," February 9, 2023, avail. at https://www.hhs.gov/sites/default/files/2022-retrospective-and-2023-look-ahead.pdf

should protect the personal customer information that they keep; properly dispose of PHI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[24]

57.     The FTC further recommends that companies not maintain PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[25]

58.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59.     These FTC enforcement actions include actions against entities failing to safeguard PHI such as Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that

---

[24] *See* Federal Trade Commission, October 2016, "Protecting Private information: A Guide for Business," available at https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last accessed Jan. 9, 2025).
[25] *See id*.

LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

60.     Medusind failed to properly implement basic data security practices widely known throughout the industry. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

61.     Defendant was at all times fully aware of their obligations to protect the Personal Information of current and former patients. Defendant was also aware of the significant repercussions that would result from their failure to do so.

### E. Defendant Failed to Comply with Industry Standards

62.     As shown above, experts studying cyber security routinely identify organizations holding PHI as being particularly vulnerable to cyber-attacks because of the value of the information they collect and maintain. As of 2022, ransomware breaches like that which occurred here had grown by 41% in the last year and cost on average $4.54 million dollars.[26]

63.     A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery,

---

[26] IBM, "Cost of a data breach 2024" available at https://www.ibm.com/reports/data-breach (last accessed Jan. 9, 2025).

Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[27]

64.     In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

- Update security software regularly, automating those updates if possible.

- Have formal policies for safely disposing of electronic files and old devices.

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[28]

65.     Upon information and belief, Medusind failed to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and other industry standards for protecting Plaintiff's and the proposed

---

[27] *See* https://www.rapid7.com/solutions/compliance/critical-controls/ (last accessed Jan. 9, 2025).
[28] Understanding The NIST Cybersecurity Framework, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last accessed Jan. 9, 2025).

Class Members' Personal Information.

**F. The Data Breach Caused Plaintiff and the Class Members Injury and Damages**

66.     Plaintiff and members of the proposed Class have suffered injury and damages from the unauthorized disclosure of their Personal Information in the Data Breach that can be directly traced to Medusind's failure to adequately protect that Personal Information.

67.     As stated, prior, in the Data Breach, unauthorized cybercriminals were able to access the Plaintiff's and the proposed Class Members' Personal Information, which on information and belief is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

68.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's Personal Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

69.     Because Defendant collectively failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, are at an increased risk of suffering, or will imminently suffer:

a.     exposure of that Personal Information, including said information being posted on the Dark Web for fraudulent, criminal activity or sale;

b.     fraudulent misuse of Personal Information, including fraudulent loans taken out using Personal Information acquired in the Data Breach, fraudulent

cellular telephone accounts taken out using Personal Information acquired in the Data Breach; and, identity theft and impersonation using Personal Information acquired in the Data Breach;

c.    Malware, and increase in spam emails;

d.    The loss of the opportunity to control how Personal Information is used;

e.    The diminution in value of their Personal Information;

f.    The compromise and continuing publication of their Personal Information;

g.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

h.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

i.    Emotional Distress;

j.    Delay in receipt of tax refund monies;

k.    Unauthorized use of stolen Personal Information; and

l.    The continued risk to their Personal Information, which remains in the possession of Defendant and is subject to further breaches so long as Medusind fails to undertake the appropriate measures to protect the Personal Information in its possession.

70.    Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

71.     There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[29]

94.     The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[30]

95.     The time-consuming process recommended by the FTC and other experts is complicated by the vulnerable situations of Defendant's patients.

96.     Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of

---

[29] *See* Gaetano DiNardi, Aura.com, "How Bad Is Identity Theft? Is It Serious?" (December 14, 2022) available at https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open%20new%20accounts,to%20repair%20your%20credit%20score (last accessed Jan. 9, 2025).
[30] *See* https://www.identitytheft.gov/Steps (last accessed Jan. 9, 2025).

victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated. [31]

97. What's more, theft of Personal Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Personal Information is a valuable property right.[32]

102. The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that PHI has considerable market value.

103. Theft of Personal Information, in particular, is problematic because: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[33]

104. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of

---

[31] *See* Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), avail. at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ citing Identity Theft Resource Center, "2021 Consumer Aftermath Report," May 26, 2021 available at https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/ (last accessed Jan. 9, 2025).

[32] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private information") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[33] *See Medical Identity Theft, Federal Trade Commission Consumer Information* (last accessed Jan. 9, 2025), http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed Personal Information to adjust their insureds' medical insurance premiums.

105.    It must also be noted there may be a substantial time lag–measured in years– between when harm occurs versus when it is discovered, and also between when Personal Information and/or financial information is stolen and when it is used.

106.    Personal Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

107.    Where the most Personal Information belonging to Plaintiff and Class Members was accessible from Medusind's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

108.    Thus, Plaintiff and the Class Members must vigilantly monitor their financial and medical accounts for many years to come.

109.    According to cybersecurity experts, "[r]eports show the value of a health record can be worth as much as $1,000, whereas on the dark web, a credit card number is worth $5 and Social Security numbers are worth $1."[34]

110.    Defendant knew or should have known of these harms which would be caused by the Data Breach they permitted to occur, and Medusind should have strengthened its data systems

---

[34] Sanjay Cherian, Forbes Magazine, "Healthcare Data: The Perfect Storm," January 14, 2022, available at https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56c88 (last accessed June 19, 2023).

accordingly.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action on behalf of herself and on behalf of all other persons

similarly situated:

> <u>Nationwide Class</u>: All persons identified by Defendant (or its agents or affiliates) as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class").

> <u>California Subclass</u>: All residents of California, Defendant has identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "California Subclass").

117.    Excluded from the Class are Defendant's officers, directors, and employees; any

entity in which Defendant has a controlling interest; and the affiliates, legal representatives,

attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members

of the judiciary to whom this case is assigned, their families and Members of their staff.

118.    Plaintiff reserves the right to amend or modify the Class definitions as this case

progresses.

119.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is

impracticable. It is reported that 360,000 individuals have been affected by this breach. The

identities of Class Members are ascertainable through Defendant's records, Class Members'

records, publication notice, self-identification, and other means.

120.    <u>Commonality</u>. There are questions of law and fact common to the Class, which

predominate over any questions affecting only individual Class Members. These common

questions of law and fact include, without limitation:

> a.      if Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and
>
> Class Members' Personal Information;

b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    if Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    if Defendant owed a duty to Class Members to safeguard their Personal Information;

f.    if Defendant breached their duty to Class Members to safeguard their Personal Information;

g.    if Defendant knew or should have known that their data security systems and monitoring processes were deficient;

h.    if Defendant should have discovered the Data Breach sooner;

i.    if Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    if Defendant's conduct was negligent;

k.    if Defendant's breach implied contracts with Plaintiff and Class Members;

l.    if Defendant were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.    if Defendant failed to provide notice of the Data Breach in a timely manner, and;

n.    if Plaintiff and Class Members are entitled to damages, civil penalties,

punitive damages, treble damages, and/or injunctive relief.

121. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

122. <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

123. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

124. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

125.     Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

126.     Likewise, particular issues under Rule 42(d)(l) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.     if Defendant failed to timely notify the public of the Data Breach;

      b.     if Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Personal Information;

      c.     if Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

      d.     if Defendant's failure to institute adequate protective security measures amounted to negligence;

      e.     if Defendant failed to take commercially reasonable steps to safeguard consumer Personal Information; and

      f.     if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

127.     Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

**COUNT I**
**NEGLIGENCE**

**(On Behalf of Plaintiff and the Class)**

128.    Plaintiff repeats and re-alleges paragraphs 1 through 127 of this Complaint and incorporates them by reference herein.

129.    Plaintiff and the Class Members entrusted their Personal Information to health care providers, who entrusted the Personal Information to Medusind to perform medical billing services.

130.    Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using the Personal Information in their care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

131.    Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure to collectively adequately safeguard the Personal Information in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that Personal Information—just like the Data Breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's Personal Information by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the Personal Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

132.    Defendant owed to Plaintiff and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their Personal Information. Defendant also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope,

nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Personal Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

133.    Defendant owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from said Defendant's inadequate security protocols. Defendans actively sought and obtained Plaintiff's and members of the Class's Personal Information.

134.    The risk that unauthorized persons would attempt to gain access to the Personal Information and misuse it was foreseeable. Given that Defendant holds vast amounts of Personal Information, it was inevitable that unauthorized individuals would attempt to access their databases containing the Personal Information—whether by a sophisticated cyberattack or otherwise.

135.    Personal Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Personal Information of Plaintiff and Class Members and the importance of exercising reasonable care in handling it.

136.    Defendant breached their duties by failing to exercise reasonable care in supervising its agents, employees, contractors, vendors, and suppliers, and in handling and securing the Personally Information of Plaintiff and Class Members, which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury-in-fact and damages.

137.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused

and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

138.    As a direct, proximate, and traceable result of Defendant's negligence, Plaintiff has suffered or will imminently suffer injury-in-fact and damages, as set forth in the preceding paragraphs.

139.    Defendant's breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including: exposure of that Personal Information, including being posted on the Dark Web for fraudulent, criminal activity or sale; fraudulent misuse of Personal Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Personal Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Personal Information is used; diminution in value of their Personal Information; compromise and continuing publication of their Personal Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional Distress; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; the continued risk to their Personal Information, which remains in the possession of Defendant and is subject to further breaches so long as Medusind fails to undertake the appropriate measures to protect the Personal Information in its possession; and, an increased risk of fraud and identity theft.

140.    As a result of the negligence of Defendant, Plaintiff and the Class Members are entitled to recover actual, compensatory, and punitive damages.

141. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) properly notify affected victims of the Data Breach (ii) strengthen their data security systems and monitoring procedures; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) provide adequate credit monitoring to all Class Members.

142. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the Personal Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the exposure of the Personal Information of Plaintiff and the Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
**(On Behalf of Plaintiff and the Class)**

143. Plaintiff repeats and re-alleges paragraphs 1 through 127 of this Complaint and incorporates them by reference herein.

144. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's Personal Information.

145. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customers or, in this case, patients' Personal Information. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and the members of the Class's sensitive Personal Information.

146.     Defendant violated its duties under Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Plaintiff's and the Class's Personal Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Personal Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to patients in the event of a breach, which ultimately came to pass.

147.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class Members.

148.     Defendant had a duty to Plaintiff and the Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class's Personal Information.

149.     Defendant breached its duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's Personal Information.

150.     Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations including HIPAA constitutes negligence *per se*.

151.     But-for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

152.     The injury and harm suffered by Plaintiff and members of the Class were the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should

have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Personal Information.

153.    Had Plaintiff and members of the Class known that Defendant did not adequately protect their Personal Information, Plaintiff and members of the Class would not have entrusted Defendant with their Personal Information.

154.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and members of the Class have suffered actual, tangible, injury-in-fact and damages, including: exposure of that Personal Information, including being posted on the Dark Web for fraudulent, criminal activity or sale; fraudulent misuse of Personal Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Personal Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Personal Information is used; diminution in value of their Personal Information; compromise and continuing publication of their Personal Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional distress; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; the continued risk to their Personal Information, which remains in the possession of Defendant and is subject to further breaches so long as Medusind fails to undertake the appropriate measures to protect the Personal Information in its possession.

155.    As a result of the negligence *per se* of Defendant, Plaintiff and the Class Members

are entitled to recover actual, compensatory, and punitive damages.

**COUNT III**
**THIRD-PARTY BENEFICIARY**
**(On Behalf of Plaintiff and the Proposed Class)**

156.     Plaintiff repeats and re-alleges paragraphs 1 through 127 of this Complaint and incorporates them by reference herein.

157.     Plaintiff and the proposed Class Members are third-party beneficiaries of contracts between Defendant and health care providers, under which Medusind received Plaintiff's and the Class's Personal Information; stored that information in its computer network systems; and provided medical billing and revenue cycle management services to their medical service providers.

158.     Plaintiff and the proposed Class Members, as patients of health care providers in contract with Medusind, were the intended beneficiaries of these contracts, in that the contracts all related to the provision of medical services to Plaintiff and the Class.

159.     Defendant has breached the foregoing contracts by failing to adequately protect Plaintiff's and the Class Members' Personal Information, resulting in the Data Breach, and injury-in-fact and damages.

160.     Defendant materially breached the contract(s) it had entered into by failing to safeguard the Personal Information entrusted to it.

161.     As a direct and proximate result, Plaintiff and Class Members are entitled to actual, compensatory, and consequential damages.

**COUNT IV**
**Violation of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On behalf of Plaintiff and the California Subclass)**

162.     Plaintiff hereby repeat and reallege paragraphs 1 through 127 of this Complaint and

incorporate them by reference herein.

163.    Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

164.    Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, *et seq*. (the "CCPA"), and other state data security laws.

165.    Defendant stored the Personal Information of Plaintiff and the California Subclass in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff's and the California Subclass's Personal Information secure to prevent the loss or misuse of that Personal Information.

166.    Defendant failed to disclose to Plaintiff and the California Subclass that their Personal Information was not secure. However, Plaintiff and the California Subclass were entitled to assume, and did assume, that Defendant had secured their Personal Information. At no time were Plaintiff and the California Subclass on notice that their Personal Information was not secure, which Defendant had a duty to disclose.

167.    Defendant also violated California Civil Code § 1798.150 by failing to implement and maintain reasonable security procedures and practices, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and the California Subclass's nonencrypted and nonredacted Personal Information.

168.    Had Defendant complied with these requirements, Plaintiff and the California Subclass would not have suffered the damages related to the data breach.

169.     Defendant's conduct was unlawful, in that it violated the CCPA.

170.     Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the Federal Trade Commission Act.

171.     Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

172.     Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting Personal Information.

173.     Defendant also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

174.     Instead, Defendant made the Personal Information of Plaintiff and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiff and the California Subclass to an impending risk of identity theft. Additionally, Defendant's conduct was unfair under the UCL because it violated the policies underlying the laws set out in

34

the prior paragraph.

175.   As a result of those unlawful and unfair business practices, Plaintiff and the California Subclass suffered an injury-in-fact and have lost money or property.

176.   For one, on information and belief, Plaintiff's and the California Subclass's stolen Personal Information has already been published—or will be published imminently—by cybercriminals on the dark web.

177.   The injuries to Plaintiff and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

178.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

179.   Therefore, Plaintiff and the California Subclass are entitled to equitable relief, including restitution of all monies paid to or received by Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

<u>**COUNT V**</u>
**Violations of the California Consumer Privacy Act ("CCPA")**
**Cal. Civ. Code § 1798.150**
**(On behalf of Plaintiff and the California Subclass)**

180.   Plaintiff hereby repeat and reallege paragraphs 1 through 127 of this Complaint and incorporate them by reference herein.

181.   Defendant violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted Personal Information of Plaintiff and the California Subclass. As a direct and proximate result, Plaintiff and the California Subclass's nonencrypted

and nonredacted Personal Information was subject to unauthorized access and exfiltration, theft, or disclosure.

182. Defendant is a "business" under the meaning of Civil Code § 1798.140 because Defendant is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code § 1798.140(d).

183. Plaintiff and California Subclass Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards Personal Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Personal Information, including Plaintiff and California Subclass members' Personal Information. Plaintiff and California Subclass members have an interest in ensuring that their Personal Information is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

184. Pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendant's registered service agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. If Defendant cannot cure within 30 days—and Plaintiff believes such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

185. As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

186. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

### COUNT VI
**Violation of the California Consumer Records Act**
**Cal. Civ. Code § 1798.80, *et seq.***
***(On behalf of Plaintiff and the California Subclass)***

187. Plaintiff hereby repeat and reallege paragraphs 1 through 127 of this Complaint and incorporate them by reference herein.

188. Under the California Consumer Records Act, any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" must "disclose any breach of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82. The disclosure must "be made in the most expedient time possible and without unreasonable delay" but disclosure must occur "immediately following discovery [of the breach], if the personal information was, *or* is reasonably believed to have been, acquired by an unauthorized person." *Id* (emphasis added).

189. The Data Breach constitutes a "breach of the security system" of Defendant.

190. An unauthorized person acquired the personal, unencrypted information of Plaintiff and the California Subclass.

191. Defendant knew that an unauthorized person had acquired the personal, unencrypted information of Plaintiff and the California Subclass but waited over one year to notify them. Given the severity of the Data Breach, one year was an unreasonable delay.

192. Defendant's unreasonable delay prevented Plaintiff and the California Subclass from taking appropriate measures from protecting themselves against harm.

193.     Because Plaintiff and the California Subclass were unable to protect themselves,
they suffered incrementally increased damages that they would not have suffered with timelier
notice.

194.     Plaintiff and the California Subclass are entitled to equitable relief and damages in
an amount to be determined at trial.

## COUNT VII
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

195.     Plaintiff repeats and re-alleges paragraphs 1 through 127 of this Complaint and
incorporates them by reference herein.

196.     This claim is pleaded as the alternative to the breach of implied contractual duty
claim.

197.     Plaintiff and the Class Members conferred a benefit upon Defendant in the form of
monies paid for medical treatment services and by providing their Personal Information to
Defendant in order to receive such services.

198.     Defendant appreciated or had knowledge of the benefits conferred upon themselves
by Plaintiff and the Class Members.

199.     As a result of Defendant's conduct, Plaintiff and members of the Class suffered
actual damages in an amount equal to the difference in value between the purchases made with
reasonable data privacy and security practices and procedures that Plaintiff and the Class Members
paid for, and the purchases without unreasonable data privacy and security practices and
procedures that they received.

200.     Under principles of equity and good conscience, Defendant should not be permitted
to retain the full value of Plaintiff's and the proposed Class Members' payments and their Personal

Information because Defendant failed to adequately protect their Personal Information. Plaintiff and the Class Members would not have provided their Personal Information, nor used and paid for Defendant's services, had they known Defendant would not adequately protect their Personal Information.

201.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually, and on behalf of all others similarly situated individually, requests that the Court enter an order:

A.     Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representatives, and appointing Plaintiff's counsel to represent the Class;

B.     Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C.     Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D.     Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E.     Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F.     Awarding attorneys' fees and costs, as allowed by law;

G.     Awarding prejudgment and post-judgment interest, as provided by law;

H.	Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.	Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 9, 2025	Respectfully submitted,

*/s/Andrew J. Shamis*
Andrew J. Shamis
**SHAMIS & GENTILE P.A.**
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Tel: (305) 479-2299
ashamis@shamisgentile.com

Scott Edelsberg
Joseph Kanee
**EDELSBERG LAW, P.A.**
20900 NE 30th Ave,
Aventura, FL 33180
Tel: (305) 975-3320
scott@edelsberglaw.com
joseph@edelsberglaw.com

*Counsel for Plaintiff and the
Proposed Class*